**2017-1798, -1799, -1800**

# United States Court of Appeals
# for the Federal Circuit

---

SUMITOMO DAINIPPON PHARMA CO., LTD.,
SUNOVION PHARMACEUTICALS INC.,

*Plaintiffs-Appellees*,

v.

EMCURE PHARMACEUTICALS LIMITED, HERITAGE PHARMA
LABS INC., fka Emcure Pharmaceuticals USA Inc., INVAGEN
PHARMACEUTICALS, INC., TEVA PHARMACEUTICALS USA, INC.,
TEVA PHARMACEUTICAL INDUSTRIES, LTD.,

*Defendants-Appellants*.

---

*Appeals from the United States District Court for the District of New Jersey
in Nos. 2:15-cv-00280-SRC-CLW, 2:15-cv-00281-SRC-CLW,
2:15-cv-06401-SRC-CLW, Judge Stanley R. Chesler.*

---

## PRINCIPAL BRIEF OF PLAINTIFFS-APPELLEES

Preston K. Ratliff II
Joseph M. O'Malley, Jr.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Stephen B. Kinnaird
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700

Charles M. Lizza
William C. Baton
SAUL EWING LLP
One Riverfront Plaza, Suite 1520
Newark, NJ 07102
(973) 286-6700

*Attorneys for Plaintiffs-Appellees*

June 26, 2017

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees certifies the following:

1. The full name of every party or amicus represented by me is:

> Sumitomo Dainippon Pharma Co., Ltd.
>
> Sunovion Pharmaceuticals Inc.

2. The names of the real parties in interest represented by me are:

> Sumitomo Dainippon Pharma Co., Ltd.
>
> Sunovion Pharmaceuticals Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> Sumitomo Dainippon Pharma Co., Ltd.:  Sumitomo Chemical Co., Ltd.;
>
> Sunovion Pharmaceuticals Inc.:  Dainippon Sumitomo Pharma America Holdings, Inc., Sumitomo Dainippon Pharma Co., Ltd., Sumitomo Chemical Co., Ltd.

4. The names of all law firms and the partners or associates that appeared for Sumitomo Dainippon Pharma Co., Ltd. and Sunovion Pharmaceuticals Inc. in proceedings before the district court or are expected to appear in this Court are:

> PAUL HASTINGS LLP:  Preston K. Ratliff II, Joseph M. O'Malley, Jr., Bruce M. Wexler, Imtiaz Yakub, Nao Takada, Mi Zhou, Leo C. DeSesso, Mark Russell Sperling, and Stephen B. Kinnaird
>
> SAUL EWING LLP:  Charles M. Lizza and William C. Baton

Date:  June 26, 2017    By:    /s/ Preston K. Ratliff II
                                Preston K. Ratliff II
                                PAUL HASTINGS LLP
                                200 Park Avenue
                                New York, NY 10166
                                (212) 318-6000

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF THE ISSUE ON APPEAL................................1

STATEMENT OF THE CASE..............................................................1

A.    Background of Enantiomers ...............................................2

B.    The '372 Patent..................................................................3

C.    Prosecution History of the '372 Patent.............................6

D.    Defendants' Claim Construction Admissions ...................8

E.    The District Court's Claim Construction .........................11

        1.    The District Court's Analysis of the Intrinsic Evidence ...................11

        2.    The District Court's Rejection of Defendants' Claim Construction Arguments .....................................13

SUMMARY OF ARGUMENT .........................................................16

ARGUMENT ....................................................................................19

A.    Standard of Review...........................................................19

B.    The District Court Correctly Construed Claim 14 ..........19

C.    The District Court's Construction Is Consistent With Defendants' Claim Construction Admissions ....................................22

D.    The District Court Correctly Deemed Irrelevant Defendants' Arguments Regarding an Alleged Common Shorthand for Identifying Racemic Mixtures...............................24

E.    Defendants' Misinterpretation of the '372 Patent and Its Prosecution History Do Not Support Their Assertions of Error .................30

CONCLUSION .................................................................................34

CERTIFICATE OF COMPLIANCE.................................................35

CERTIFICATE OF SERVICE .........................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Perrigo*,
  616 F.3d 1283 (Fed. Cir. 2010) ....................................................................21, 34

*Eli Lilly & Co. v. Zenith Goldline Pharms., LLC*,
  No. IP 99-38-C HK
  2001 WL 1397304 (S.D. Ind. Oct. 29, 2001) ...............................................28, 29

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.,*
  405 F. Supp. 2d 495 (D. Del 2005)
  *aff'd*, 457 F.3d 1284 (Fed. Cir. 2006)...................................................................3

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.*,
  457 F.3d 1284 (Fed. Cir. 2006) ......................................................17, 26, 27, 29

*Pfizer Inc. v. Teva Pharms. USA., Inc.*,
  555 F. App'x 961 (Fed. Cir. 2010) ......................................................17, 18, 28

*Phillips v. AWH Corp.*,
  415 F. 3d 1303 (Fed. Cir. 2005) .................................................................16, 23

*Teva Pharms USA, Inc. v. Sandoz, Inc.,*
  135 S. Ct. 831 (2015)..................................................................................19, 25

**Other Authority**

Manual of Patent Examining Procedure § 803 (Jan. 1995) .......................................7

## TABLE OF ABBREVIATIONS

| "the '372 patent" | U.S. Patent No. 5,532,372 |
|---|---|
| "Appellants" or "Defendants" | Appellants Emcure Pharmaceuticals Limited, Heritage Pharma Labs Inc., fka Emcure Pharmaceuticals USA Inc.; InvaGen Pharmaceuticals, Inc.; and Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd. |
| "Appellees" or "Sunovion" | Appellees Sumitomo Dainippon Pharma Co., Ltd. and Sunovion Pharmaceuticals Inc. |
| "DBr." | Appellants' Opening Brief |
| "Emcure" | Appellants Emcure Pharmaceuticals Limited, Heritage Pharma Labs Inc., fka Emcure Pharmaceuticals USA Inc. |
| "InvaGen" | Appellant InvaGen Pharmaceuticals, Inc. |
| "Teva" | Appellants Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd. |

## STATEMENT OF RELATED CASES

Appellees Sumitomo Dainippon Pharma Co., Ltd. and Sunovion

Pharmaceuticals Inc. (collectively, "Sunovion") have asserted the '372 patent in

two other cases: *Sumitomo Dainippon Pharma Co., Ltd., et al. v. Amneal*

*Pharmaceuticals LLC*, 2:16-cv-04596-SRC-CLW (D.N.J.) ("the Amneal case")

and *Sumitomo Dainippon Pharma Co., Ltd., et al. v. MSN Laboratories Private*

*Ltd., et al.*, 2:17-cv-01010-SRC-CLW (D.N.J.) ("the MSN case"). The defendant

in the Amneal case has agreed to a final judgment of infringement and an

injunction that is not affected by the outcome of this Appeal. It is too early to

determine whether the outcome of this Appeal will have any effect on the MSN

case because that case is in its initial stages.

## STATEMENT OF THE ISSUE ON APPEAL

The issue on appeal is whether the district court correctly ruled that

Claim 14 of the '372 patent should be construed according to well-established

claim construction principles to encompass the chemical compound lurasidone

(a preferred embodiment of the patent), or should instead be construed to exclude

lurasidone, as Appellants Emcure, InvaGen, and Teva argue.

## STATEMENT OF THE CASE

This case arises from a consolidated patent infringement action brought

under the Hatch-Waxman Act against three generic drug manufacturers: Emcure,

InvaGen, and Teva. Emcure, InvaGen, and Teva each filed Abbreviated New

Drug Applications with the Food and Drug Administration ("FDA") seeking approval to market generic versions of LATUDA®, Sunovion's highly successful medication for treating schizophrenia and bipolar depression.  The active ingredient in LATUDA® is a chemical compound known today as lurasidone.

Citing the '372 patent specification and prosecution history, the district court construed Claim 14 to encompass lurasidone.  (Appx30.)  The district court found that Defendants' proposed construction, which excludes lurasidone and limits Claim 14 to one specific 50:50 mixture of two chemical compounds, conflicts with the patent specification's teachings and prosecution history.  (Appx30.)  The sole issue on appeal is the propriety of the district court's claim construction.

## A.    Background of Enantiomers

Chemical compounds can encompass structurally identical compounds that differ only in that one isomer, called an enantiomer, is a mirror image of the other and the mirror images cannot be superimposed.  (Appx485-487 (¶¶ 11-19).)  When chemists synthesize an organic compound that has a stereogenic carbon, the material that they obtain, depending on the synthesis process used, may contain an equal mixture of two enantiomers, such that it contains exactly 50% of the (+)-enantiomer and exactly 50% of the (−)-enantiomer.  (Appx488 (¶ 20).) Such material is referred to as a "racemic mixture" or "racemate."  (Appx488 (¶ 20).)  Other mixtures of enantiomers, such as a mixture containing 55% of

the (+)-enantiomer and 45% of the (−)-enantiomer, are not racemic mixtures. (Appx488 (¶ 20).) As explained below, the chemical compound lurasidone is not a racemic mixture.

An enantiomer can be chemically separated from its opposite enantiomer. (Appx488 (¶ 20).) The isomers of enantiomeric pairs are distinguished by the direction that they rotate polarized light: "(+)" for dextrorotatory enantiomers, and "(−)" for levorotatory enantiomers. (Appx488 (¶ 19).) For a further background discussion of enantiomers *see*, *e.g.*, *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 405 F. Supp. 2d 495, 502-03 (D. Del. 2005), *aff'd*, 457 F.3d 1284, 1290 (Fed. Cir. 2006).

## B.    The '372 Patent

The '372 patent issued on July 2, 1996 and is a composition patent directed to chemical compounds. (Appx70, Appx71 (1:6-8).) The '372 patent teaches that its claimed chemical compounds are useful antipsychotic agents having a novel chemical formula set out in the specification. (Appx70 (Abstract), Appx72 (3:3-4:68).) Various embodiments of the '372 patent are described throughout its specification and several preferred embodiments are illustrated, such as Compound No. 105. (*E.g.*, Appx85 (30:30-32:23).) Example 1-(e) of the '372 patent discloses Compound No. 105, which is known today as lurasidone in the form of a hydrochloric acid addition salt, or lurasidone hydrochloride. (Appx77 (14:56-60), Appx86 (32:17-22), Appx492-493 (¶¶ 33-34).) Lurasidone hydrochloride is the

- 3 -

particular form of lurasidone within both LATUDA® and Defendants' proposed generic products.  (Appx442-443, Appx450-451, Appx460-461.)  The '372 patent states that the "invention covers the acid addition salt formed between [its chemical compounds] and an organic or inorganic acid."  (Appx72 (4:44-46).)

The '372 patent also states that its chemical compounds "can have stereo and optical isomers, and ***this invention involves these isomers or their mixtures as well***."  (Appx72 (4:51-53) (emphasis added).)  In other words, the '372 patent teaches that its chemical compounds encompass enantiomers as well as mixtures of enantiomers.  (Appx490-491 (¶¶ 28-29).)  In the case of lurasidone, its enantiomer is illustrated in Example 1-(d) of the '372 patent as Compound No. 104 in the form of a hydrochloric acid addition salt.  (Appx86 (32:1-14), Appx491 (¶ 30).)  Further, the '372 patent illustrates a mixture of lurasidone and its enantiomer in a hydrochloric acid addition salt form in Example 1-(a) as Compound No. 101. (Appx85-86 (30:30-31:9), Appx491 (¶ 30).)

In addition to describing its claimed chemical compounds, the '372 patent discloses specific examples of "preferred embodiments."  (Appx77 (14:56-59), Appx85-86 (30:30-32:23), Appx492 (¶ 34).)  Example 1 of the '372 patent, for example, includes:

- lurasidone in the form of a hydrochloride (Compound No. 105);
- lurasidone's enantiomer in the form of a hydrochloride (Compound No. 104);

- lurasidone's enantiomer in the form of an L-tartrate (Compound No. 102);

- lurasidone in the form of a D-tartrate (Compound No. 103); and

- the mixture in the form of a hydrochloride (Compound No. 101).

(Appx85-86 (30:30-32:23), Appx491-492 (¶¶ 30-33).)  During his deposition,

Defendants' expert, Stephen W. Baldwin, Ph.D., agreed that all of these

compounds are preferred embodiments of the '372 patent.  (Appx1361 (223:4-24).)

In addition to disclosing lurasidone as a preferred embodiment,

the '372 patent reports dopamine $D_2$ receptor binding affinity data for lurasidone

hydrochloride.  (Appx77 (13:2-10).)  According to the specification, there is a

correlation between antipsychotic activity and dopamine $D_2$ receptor binding

activity.  (Appx76 (12:31-34).)  The specification also teaches that lurasidone

hydrochloride binds to the dopamine $D_2$ receptor and has "excellent antipsychotic

activity."  (Appx76-77 (12:31-34, 13:2-10, 14:49-51).)

The '372 patent has 20 claims directed to its novel chemical compounds.

(Appx100-103 (60:35-65:50).)  Claim 14 of the '372 patent is the narrowest claim

that covers lurasidone.  (Appx102, Appx459.)  Claim 14 is reproduced below.

14. The imide compound of the formula:



or an acid addition salt thereof.

The district court construed the two-dimensional drawing in Claim 14 to mean "lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers." (Appx30.) The terminal clause "or an acid addition salt thereof" refers to the specification's teaching that the invention additionally covers acid addition salts of its claimed compounds, such as lurasidone hydrochloride. (Appx26.)

## C.    Prosecution History of the '372 Patent

During the prosecution of the '372 patent, the inventors stated their intention to claim, among other things, lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers. The '372 patent issued from U.S. Application No. 08/113,320 ("the '320 application"), which is a continuation application of U.S. Patent Application No. 07/726,172 ("the '172 application"). (Appx70.) On March 1, 1993, the '372 patent inventors amended the '172 application to include Application Claims 11-27. (Appx951-959.) Application Claim 27 ultimately issued as Claim 14 of the '372 patent. (Appx958.)

On December 29, 1994, in the '320 application, the inventors submitted a declaration from a scientist to support the patentability of the then claimed

chemical compounds of Application Claims 11-27:

> From [the Declaration by Dr. Yukihiro Ohno] it is
> apparent that the claimed compound (***e.g. Compound
> No. 101***) increased punished responding significantly
> at 10 and 30 mg/kg in comparison with the control,
> and its potency at 10 mg/kg is almost the same level
> as the commercial antianxiety drug (e.g. Diazepam).
> Applicants submit that the test results reported in the
> specification and in the attached Declaration of
> Dr. Ohno, taken together with the knowledge of those
> skilled in the art as evidenced by the scientific
> literature, are sufficient to establish the utility of ***the
> claimed compounds*** as required by 35 U.S.C. 101.

(Appx983 (emphases added).)

On February 28, 1995, the patent examiner issued a restriction or election

requirement in the '320 application.  (Appx960-962.)  A restriction or election

requirement is not a rejection.  It is a routine procedure used by patent examiners

to reduce burdens that may arise in applications having more than one patentably

distinct invention.  *See* January 1995 Manual of Patent Examining Procedure

§ 803.

On March 30, 1995, in response to the restriction or election requirement,

the applicants stated:

- "In particular, it is applicants' desire to ***elect a group
  which encompasses Compound No. 101, namely
  Example 1 in the application***."

- "the applicants provisionally elect the species of
  Compound No. 101, ***namely Example 1***"

(Appx965 (emphases added).)

As explained above, Example 1 is not limited to a single compound. (*See supra* pp. 4-5.) Example 1 exemplifies Compound Nos. 101, 102, 103, 104, and 105. Compound No. 105 is lurasidone hydrochloride, Compound No. 104 is lurasidone's enantiomer as a hydrochloride salt, and Compound No. 101 is a mixture of lurasidone and lurasidone's enantiomer as a hydrochloride salt. (Appx85-86 (30:30-32:23).)

Sunovion also informed the United States Patent and Trademark Office ("USPTO") that Claim 14 encompassed the chemical compound known today as lurasidone. (Appx476-477.) Specifically, given the lengthy FDA regulatory review period for approving LATUDA® as a drug, Sunovion identified Claim 14 of the '372 patent to the USPTO as covering the drug's active ingredient lurasidone in support of an application for a patent term extension. (Appx476-477.) After reviewing Sunovion's application, the USPTO granted a term extension pursuant to 35 U.S.C. § 156. (Appx478-480.)

## D.    Defendants' Claim Construction Admissions

Prior to the filing of Sunovion's infringement action, each of Defendants Emcure, InvaGen, and Teva sent Sunovion a "Paragraph IV Notice Letter" describing the bases for their belief that they could market generic lurasidone products before the expiration of the '372 patent. (Appx442, Appx450, Appx461-

462.)  While Emcure, InvaGen, and Teva contested the validity of the '372 patent, they each concluded independently that they infringed Claim 14.  (*E.g.*, Appx444-445, Appx447-449, Appx459, Appx466.)  Importantly, this concession was made after Defendants studied Claim 14, the '372 patent specification, and the '372 patent prosecution history.  (*E.g.*, Appx444-445, Appx446-447, Appx454-457, Appx463-465.)  In Teva's and Emcure's Paragraph IV Notice Letters and in InvaGen's Invalidity Contentions, each Defendant ***admitted*** that Claim 14 encompassed lurasidone:

- "Claim 14 of the '372 patent is the narrowest claim that ***covers lurasidone***" (Teva);

- "the compound of claim 14 of the '372 patent (**i.e., *lurasidone***)" (Emcure); and,

- "Claim 14 of the '372 Patent is directed to the imide compound . . . also ***known as lurasidone***." (InvaGen).

(Appx459 (emphasis added), Appx466 (emphasis added), Appx448-449 (emphasis added).)

Moreover, Teva's Paragraph IV Notice Letter includes an entire section devoted to and entitled "Claim Construction."  (Appx454-457.)  Consistent with the district court's ruling, Teva concludes in this section of its Paragraph IV Notice Letter that Claim 14 encompasses lurasidone.  (Appx457.)

In addition, five months after the January 14, 2015 filing of Sunovion's infringement case, InvaGen and Emcure sent Sunovion nearly identical "Supplemental" Paragraph IV Notice Letters regarding the '372 patent wherein they again did not contest infringement of Claim 14.  (Appx467-470, Appx471-473.)  Once again, InvaGen and Emcure stated that Claim 14 encompasses lurasidone and acid addition salts of lurasidone.  (Appx469-470 (discussing the "acid addition salts of *lurasidone covered* by claim[] . . . 14." (emphasis added)), Appx473 (stating the same).)

Although the district court did not base its claim construction on these admissions from Defendants, it did note that Emcure, InvaGen, and Teva changed their position for the claim construction proceedings.  (Appx28 (n.8).)  Notably, Defendants tried to conceal their admissions from their claim construction expert Dr. Baldwin.  Dr. Baldwin testified at his deposition that he saw the reference to Defendants' admissions in Sunovion's opening claim construction brief before the district court, but Emcure, InvaGen, and Teva told him those were documents he did not need to read:

> Q.    And after seeing that, did you review documents that plaintiffs were citing to concerning plaintiffs' assertion that defendants have already conceded that Claim 14 covers lurasidone?
>
> **A.    I reviewed no other documents, no.**

Q.    You weren't curious to see what was the basis for plaintiffs' statements in that regard?

**A.    I mean I did ask is this a document I should be reading and they said you don't need to.**

(Appx1349 (135:13-136:23) (emphases added).)

After reviewing Teva's and Emcure's Paragraph IV Notice Letters, Dr. Baldwin testified at his deposition that Teva and Emcure had admitted that lurasidone was covered by Claim 14.  (Appx1348-1352 (133:21-134:14, 139:10-142:5, 143:3-146:17).)

**E.    The District Court's Claim Construction**

**1.    The District Court's Analysis of the Intrinsic Evidence**

The district court construed Claim 14 to encompass lurasidone, ruling that the two-dimensional drawing depicted in Claim 14 means:  "lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers."  (Appx30.) The district court's claim construction ruling was based on well-established claim construction principles.  The district court stated that it considered first the intrinsic evidence to resolve the claim construction dispute.  (Appx28.)  The district court reviewed the '372 patent specification, noting in particular the patent's abstract and the detailed description of the claimed inventions in columns 3 and 4 of the patent. (Appx28.)

The district court pointed out the specification's teaching that its chemical compounds "can have stereo and optical isomers, and this invention involves these

isomers or their mixtures as well." (Appx28.)  The court explained that this

teaching at column 4, lines 51-53 is "important intrinsic evidence that the

applicants understood all the imide compounds (I) *in all claims* to have stereo and

optical isomers, and that such isomers, as well as mixtures of isomers, *fall within*

*the scope of the claims*." (Appx28 (emphases added).)  The district court also

recognized that Defendants' proposed construction seeking to limit Claim 14 to

one specific 50:50 mixture of two chemical compounds conflicted "irreconcilably"

with the "important" intrinsic evidence at column 4, lines 51-53 in the

specification. (Appx28-29.)  In addition, the district court determined that

Defendants did not identify "any expression of manifest restriction that might

allow their proposed construction to escape the impact of this statement."

(Appx29.)

The district court also considered the prosecution history.  The district court

noted that it had reviewed each of the statements cited by Defendants as

purportedly claim-limiting. (Appx25-26.)  In particular, those statements include

the statement regarding the Ohno Declaration quoted above and statements made

by the applicants in response to the restriction or election requirement that are also

quoted above. (*See supra* pp. 7, Appx25 (n.7).)  The court concluded that the cited

statements support Sunovion's proposed construction and do not support limiting

Claim 14 to one specific 50:50 mixture of two chemical compounds. (Appx25,

Appx29.)  Further, the court determined that "Defendants have not pointed to any expressions of manifest exclusion or restriction in the patent which could justify restricting claim 14 to any particular embodiment."  (Appx27.)

### 2.    The District Court's Rejection of Defendants' Claim Construction Arguments

In construing Claim 14, the district court rejected the extrinsic evidence that allegedly supported Defendants' proposed construction.  (Appx23-24.) Specifically, Emcure, InvaGen, and Teva relied on two book excerpts to argue that Claim 14 depicts a single enantiomer, and that a drawing of a single enantiomer is a common shorthand for a racemic mixture.  (Appx23.)  During his deposition, Defendants' expert Dr. Baldwin conceded that the book excerpts were not available to the person of ordinary skill because they were not published until many years after the July 5, 1991 patent application that led to the '372 patent was submitted to the USPTO.  (Appx1353 (150:7-151:5, 151:25-152:9).)  The first extrinsic document, *Organic Chemistry* by Jones, was published in 1997, six years after the July 5, 1991 patent application was filed.  (Appx1015-1016 (¶ 27).)  The second extrinsic document, the sixth edition of *Organic Chemistry: Structure and Function* by Vollhardt & Schore, was published in 2010, nearly 20 years after the application was filed.  (Appx1015-1016 (¶ 27).)  Further, Dr. Baldwin confirmed that the paragraph he cited in Vollhardt & Schore did not appear in earlier editions of that publication that he had reviewed.  (Appx1354 (156:22-157:16).)  In

addition, Dr. Baldwin confirmed during his deposition that Vollhardt & Schore concerns "conventions of writing chemical equations where racemates are involved," but Claim 14 does not contain a chemical equation.  (Appx1015 (¶ 27), Appx1355 (158:8-17).)

The district court made an evidentiary finding that the extrinsic sources relied on by Defendants did not support their proposed construction.  (Appx23-24.) With respect to Jones, the district court concluded that "if anything, [it] supports the contrary proposition that a drawing of a single enantiomer has an ambiguous meaning."  (Appx24.)  With respect to Vollhardt & Schore, the district court determined that this extrinsic document was irrelevant because it dealt only with chemical equations.  (Appx24.)  In doing so, the district court's opinion is consistent with Defendants' expert Dr. Baldwin's opinion that Claim 14 does not contain a chemical equation.  (Appx24, Appx1355 (158:14-17).)

The district court further found Defendants' argument that Claim 14 is limited to Compound No. 101 to be contrary to (a) the terminal clause of Claim 14, which states "or an acid addition salt" and (b) the specification's teaching at column 4, lines 44-46 that the invention covers other acid addition salts such as hydrobromic and sulfuric acid addition salts.  (Appx26.)  In other words, the district court found that Claim 14 could not be limited to Compound No. 101, which is a hydrochloric acid addition salt, when the specification and claim

language itself says the claimed compounds do not have to be one particular acid addition salt but can be acid addition salts other than the hydrochloric acid addition salt. (Appx26.)

The district court also noted that Defendants' construction did not have any basis in law. (Appx21-22.) For example, the district court observed that Emcure, InvaGen, and Teva did not claim that the ordinary meaning of Claim 14 is a racemic mixture. (Appx21.) Further, the court found that Defendants did not argue that their proposed construction was based on lexicography or claim disavowal. (Appx21-22.) Instead, Defendants advocated for their proposed construction based on the Jones and Vollhardt & Schore book excerpts that the district court found unpersuasive. (Appx20-24.)

After the district court's claim construction ruling, each of the Defendants stipulated to infringement and conceded that Claim 14 is valid and enforceable. The district court entered a Final Judgment and Order of Permanent Injunction as to Emcure and Teva on February 14, 2017, and as to InvaGen on February 28, 2017. (Appx1-9, Appx10-16.)

On appeal, Defendants state throughout their principal brief that (a) the parties agree at least in part as to the scope of Claim 14 of the '372 patent and (b) the parties agree that Claim 14 depicts only one particular enantiomer. (*E.g.*, DBr. 2-3, 16-17, 19.) This is incorrect. (*See* Appx27-28.) Sunovion reached no

such agreements with Defendants and maintains that the drawing depicted in Claim 14, as properly construed by the district court, represents "lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers."

## SUMMARY OF ARGUMENT

This Appeal concerns whether the district court correctly ruled that Claim 14 of the '372 patent should be construed to encompass the chemical compound lurasidone (a preferred embodiment of the patent), or should instead be construed to exclude lurasidone and limited to one specific 50:50 mixture of two chemical compounds. As explained below, the district court's construction was correct and should be affirmed.

Understanding that the specification is the single best guide to the meaning of a disputed term, the district court relied on the '372 patent specification as well as the plain language of the claim to construe Claim 14. (Appx18-19 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)), Appx28-30.) In particular, the district court found as "impact[ful]" evidence the '372 patent specification's explicit teaching that its disclosed compounds "can have stereo and optical isomers, and *this invention involves these isomers or their mixtures as well*." (Appx28-29 (emphasis added).) The district court explained that this teaching is "important intrinsic evidence that the applicants understood all the imide compounds (I) *in all claims* to have stereo and optical isomers, and that such

- 16 -

isomers, as well as mixtures of isomers, *fall within the scope of the claims*."
(Appx28 (emphases added).)

The district court also analyzed the patent prosecution history cited by the parties and determined that it demonstrates that the inventors intended Claim 14 to encompass a genus of compounds.  (Appx25, Appx29-30.)  As the court determined, this genus includes "lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers."  (Appx30.)

On appeal, Emcure, InvaGen, and Teva argue that the district court committed a "host of legal errors" in adopting a construction they each agreed with at the time they sent their Paragraph IV Notice Letters.  (DBr. 17, 27.)  Specifically, Defendants argue that the court erred by disregarding the alleged common usage of depicting a single enantiomer as shorthand for a racemic mixture.  (DBr. 18, 33.)  As the court explained, however, the evidence that Defendants relied on was irrelevant and contradicts Defendants' assertion that the drawing in Claim 14 is shorthand for a racemic mixture.  (Appx23-24.)  Notably, this Court in *Pfizer v. Ranbaxy* rejected a generic drug manufacturer's similar attempt to limit a chemical compound claim to a racemic mixture based on an argument that the depiction of an enantiomer is a common shorthand in the art for identifying a racemic mixture.  *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006); *see also Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F.

App'x 961, 965-66 (Fed. Cir. 2014) (nonprecedential) (rejecting Teva's attempt to limit a chemical compound claim to a racemic mixture).

Emcure, InvaGen, and Teva also argue that the district court failed to correctly interpret the '372 patent and its prosecution history.  (DBr. 3, 30-33.)  To the contrary, the district court's interpretation of the '372 patent and its prosecution history was well-reasoned and correct.  For example, the district court thoroughly explained in its opinion the specification's teaching of the invention encompassing enantiomers as well as their mixtures, and how that teaching applied to Claim 14. (Appx28-29.)  In addition, the court explained why the cited patent prosecution statements support its claim construction and are contrary to Defendants' proposed construction.  (Appx25, Appx29.)

Defendants' assertion that the district court wrongly characterized their arguments as divorced from accepted methods of claim construction is also meritless.  (DBr. 27-30.)  As the court explained, Emcure, InvaGen, and Teva made "no case" for a theory of plain meaning, lexicography, or disavowal. (Appx22.)  Instead, the court explained that Defendants' claim construction appeared to be rooted in extrinsic evidence that was "irrelevant" and "contradict[ed]" Defendants' own claim construction.  (Appx24.)

# ARGUMENT

## A.   Standard of Review

"[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Where, like here, the district court makes evidentiary findings about extrinsic evidence, those findings are reviewed for clear error on appeal. *Id.*

## B.   The District Court Correctly Construed Claim 14

The district court properly determined that Claim 14 encompasses lurasidone, ruling that the disputed portion of Claim 14 means: "lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers." (Appx30.) The court grounded its construction in the intrinsic record as it would be understood by those skilled in the art. The district court recognized that at column 4, lines 51-53, the patent teaches that its chemical compounds "can have stereo and optical isomers, and this invention involves these isomers or their mixtures as well." (Appx28.) The court explained that this teaching, found in the description section of the patent, is "important intrinsic evidence that the applicants understood all the imide compounds (I) *in all claims* to have stereo and optical isomers, and that such isomers, as well as mixtures of isomers, *fall within the*

*scope of the claims*." (Appx28 (emphases added).) Contrary to Defendants'

argument, the language of the specification is inclusive and puts the public on

notice that the inventors are claiming individual enantiomers as well as mixtures of

those enantiomers. Thus, the patent specification fully supports the district court's

construction that the ordinary and customary meaning of the two-dimensional

drawing depicted in Claim 14 encompasses lurasidone, lurasidone's enantiomer, as

well as mixtures of these enantiomers.

In addition to the teachings referenced above, the '372 patent expressly

identifies embodiments that Defendants' own expert, Dr. Baldwin, characterized as

"preferred." (Appx1361 (223:3-24).) While these preferred embodiments would

fall within the scope of the district court's construction, they would be excluded by

Defendants' proposed construction. Those preferred embodiments include, for

example, lurasidone hydrochloride (Compound No. 105), lurasidone's enantiomer

in a hydrochloride salt form (Compound No. 104), and a mixture of this

enantiomeric pair in a hydrochloride salt form (Compound No. 101). (Appx77

(14:56-59), Appx85-86 (30:30-32:23, Example 1-(a) – Example 1-(e)).) Indeed,

the '372 patent provides data regarding lurasidone's antipsychotic activity that

further confirms it is a preferred embodiment. (Appx76-77 (12:31-34, 13:2-10,

14:49-59).) These teachings, together with the plain language of Claim 14,

demonstrate that consistent with the district court's ruling, Claim 14 does not

exclude lurasidone, as Defendants argue. *Adams Respiratory Therapeutics, Inc. v. Perrigo*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support" (internal quotation mark omitted).)

The district court also reviewed the prosecution history and concluded that Claim 14 encompasses lurasidone and is not narrowly limited to one specific 50:50 mixture of two chemical compounds, as postured by Defendants. (Appx25, Appx29.) The court explained that the statements cited by Emcure, InvaGen, and Teva as purportedly claim-limiting did not support Defendants' argument. (Appx29.) As demonstrated in Section C of the Statement of the Case, the prosecution history, taken as a whole, shows that the inventors intended Claim 14 to be a genus of compounds rather than the specific 50:50 mixture of two chemical compounds advocated by Defendants. (Appx25, Appx29.) At a minimum, Defendants' cited portions of the prosecution history fall well short of demonstrating the clear and unmistakable disavowal needed to support Defendants' proposed claim-limiting construction.

Notably, Emcure, InvaGen, and Teva did not contest, at the district court or in their principal brief on appeal, that Sunovion identified Claim 14 to the USPTO as covering lurasidone in the prosecution history. (Appx474-477.) As explained above in Section C of the Statement of the Case, the USPTO granted Sunovion a

- 21 -

patent term extension pursuant to 35 U.S.C. § 156 after Sunovion informed the

USPTO that lurasidone, the active ingredient in both LATUDA® and Defendants'

proposed generic drug products, was covered by Claim 14.  (Appx478-480.)

During his deposition, Defendants' expert Dr. Baldwin confirmed that he knew

Sunovion's patent term extension application and the USPTO's response were part

of the prosecution history, and that he was aware of this intrinsic evidence.

(Appx1344 (82:20-84:7, 84:9-85:2).)  This intrinsic evidence also demonstrates

that Claim 14 encompasses lurasidone and is not limited to one specific 50:50

mixture of two chemical compounds, as Defendants assert.

## C.    The District Court's Construction Is Consistent With Defendants' Claim Construction Admissions

While the district court based its opinion on the intrinsic record, the court,

along with Defendants' expert Dr. Baldwin, agreed that Emcure, InvaGen, and

Teva previously ***admitted*** that Claim 14 encompassed lurasidone.  (Appx28 (n.8.),

Appx1348-1352 (133:21-24, 135:13-136:23, 139:10-142:5, 143:8-146:17).)

Indeed, the district court's construction is consistent with each of Defendants'

admissions.  In Teva's and Emcure's Paragraph IV Notice Letters and in

InvaGen's Invalidity Contentions, each Defendant admitted that Claim 14 covers

lurasidone:

- "Claim 14 of the '372 patent is the narrowest claim that ***covers lurasidone***" (Teva);

- "the compound of claim 14 of the '372 patent (**i.e., lurasidone**)" (Emcure); and

- "Claim 14 of the '372 Patent is directed to the imide compound . . . also **known as lurasidone**." (InvaGen).

(Appx459 (emphasis added), Appx466 (emphasis added), Appx448-449 (emphasis added).)

As mentioned in Section D of the Statement of the Case, Teva's Paragraph IV Notice Letter includes an entire section devoted to and entitled "Claim Construction." (Appx454-457.) In that section of its Paragraph IV Notice Letter, Teva concludes that Claim 14 encompasses lurasidone, consistent with the district court's construction. (Appx457.)

Further, the record demonstrates Teva reached its conclusion that Claim 14 encompasses lurasidone based on the intrinsic evidence, which is the principal source for a proper claim construction analysis. (Appx454-457); *see Phillips*, 415 F.3d at 1315 ("[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history" (internal quotation marks omitted).) For example, Teva analyzed Claim 14 as well as the '372 patent specification, and concluded that Claim 14 covers lurasidone hydrochloride (Compound No. 105). (Appx454-457.) As Teva admitted, "Claim 14 of the '372 patent is the narrowest claim that covers lurasidone." (Appx459.)

Accordingly, Defendants' assertions that the district court erred are belied by their multiple and unequivocal admissions which are consistent with the district court's construction.

## D.    The District Court Correctly Deemed Irrelevant Defendants' Arguments Regarding an Alleged Common Shorthand for Identifying Racemic Mixtures

Emcure, InvaGen, and Teva argue that the district court erred by disregarding the alleged common usage of depicting a single enantiomer as shorthand for a racemic mixture.  (*E.g.*, DBr. 33.)  Specifically, Defendants argue that based on two book excerpts that were not in existence at the time of invention, Jones and Vollhardt & Schore, the district court should have limited Claim 14 to a racemic mixture because, allegedly, there is a common shorthand in the art for identifying racemic mixtures.  (*E.g.*, DBr. 33-36.)

After analyzing and weighing the evidence, the district court determined that the two post-filing book excerpts were irrelevant and contradict Defendants' assertion that the drawing in Claim 14 is a shorthand for a racemic mixture. (Appx21 (n.2), Appx23-24.)  With respect to Jones, the court correctly concluded that Jones did not support the proposition that a drawing of a single enantiomer always signifies a racemic mixture.  (*See* Appx23-24.)  With respect to Vollhardt & Schore, the district court correctly concluded it was irrelevant because it dealt only with chemical equations whereas Claim 14 is not a chemical equation.  (*See*

Appx24.)  The district court's evidentiary finding regarding Defendants' principal evidence should not be disturbed absent clear error.  *Teva*, 135 S. Ct. at 841.

Further, Defendants' two book excerpts are irrelevant because they are premised on purported situations where a chemist is trying to only depict either a particular enantiomer or a racemic mixture.  Here, the inventors selected the two-dimensional drawing in Claim 14 to represent a genus of chemical compounds.  As mentioned in Section E of the Statement of the Case, Defendants state in their principal brief that the parties agree that Claim 14 depicts only one particular enantiomer, but this is not true.  (*See supra* pp. 15-16.)  Sunovion maintains that the drawing depicted in Claim 14 represents "lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers."  Defendants' statement that Claim 14 depicts only one enantiomer is also inconsistent with their arguments before the district court and on appeal that the drawing depicted in Claim 14 is identical to Compound No. 101, which Defendants argue is a racemic mixture.  (*E.g.*, DBr. 33, 37, Appx25-26.)

In addition to the two post-filing book excerpts, Defendants' expert, Dr. Baldwin, relies on five journal articles to argue that a depiction of one enantiomer is often a shorthand for a racemic mixture.  (DBr. 36, Appx1016

(¶ 28).)  Sunovion's expert, Professor Stephen G. Davies[1], testified in deposition that he had read these journal articles and that Dr. Baldwin mischaracterized them in his declaration.  (Appx1371 (41:13-44-8).)  For example, Dr. Davies explained that some of those documents use structural drawings to depict single enantiomers and racemic mixtures alike, and the implication by Dr. Baldwin that they only depict racemic mixtures is incorrect.  (Appx1371 (41:13-44-8).)  According to Dr. Davies, a chemical structure is commonly used by a chemist to "depict both single enantiomers, racemates, and any mixture in between, not just racemates." (Appx1371 (44:24-45:8).)  Dr. Davies' opinion is consistent with the district court's claim construction because it explains that two-dimensional drawings are often used to represent a genus of compounds, and not limited to one specific 50:50 racemic mixture, as Defendants propose.

In *Pfizer v. Ranbaxy*, this Court rejected a generic drug manufacturer's similar attempt to limit a chemical compound claim to a racemic mixture based on an argument that there is a common shorthand in the art for identifying a racemic mixture.  457 F.3d at 1290.  In the *Pfizer v. Ranbaxy* case, the defendant Ranbaxy argued that a claim to a chemical compound was limited to a racemic mixture in an

---

[1]  Sunovion's expert, Professor Stephen G. Davies, is the Waynflete Professor of Chemistry at the University of Oxford.  (Appx482 (¶ 1), Appx498.)  Dr. Davies received a D.Phil. degree in Chemistry from the University of Oxford in 1975 and a D.Sc. degree in Chemistry from the University of Paris in 1980.  (Appx482 (¶ 2), Appx498.)

attempt to avoid infringement. *Id.* at 1288. Like Defendants here, Ranbaxy argued that there is a common usage in the art for identifying a racemic mixture. *Id.* at 1288-89. In response, this Court stated that even if a racemic mixture was commonly represented by depicting one of its constituent enantiomers, it does not follow that the depiction of a single enantiomer ***always*** represents only a racemate. *Id.* at 1290. The district court did not commit error where Defendants' evidence was both irrelevant, as determined by the district court, and in furtherance of an argument that has been rejected by this Court.

Notably, in his declaration in support of Defendants' claim construction, Dr. Baldwin argues that the '372 patent discloses many compounds with reaction sequences that produce racemic mixtures. (Appx1019-1020 (¶ 40).) This claim-limiting argument was also rejected by this Court in *Pfizer v. Ranbaxy*. 457 F.3d at 1289-90.

Dr. Baldwin also relies on a 2011 patent application filed by a different group of inventors for a different invention in advocating for a limiting claim construction. (Appx1016-1017 (¶ 29).) Putting aside that this is yet another extrinsic document that did not exist at the time of the invention, this Court held in *Pfizer v. Ranbaxy* that statements made during prosecution of a later, unrelated patent cannot be used to interpret claims of the patent-in-suit. 457 F.3d at 1289-90.

Further, Defendants highlight that the '372 patent inventors disclosed Compound No. 101 with corresponding test data in tables within the '372 patent and in other places within the intrinsic record. (*E.g.*, DBr. 10-11, 21-22.) This is no surprise as Compound No. 101 is one of the compounds that the '372 patent claimed. As the Court noted in *Pfizer v. Teva*, "[a]bsent a clear disavowal or lexicographic definition in the specification or the prosecution history, the reporting of test results limited to a racemate does not warrant importing a racemic limitation" into a claim. 555 F. App'x at 965. The facts of the present action are even more compelling as to why Claim 14 of the '372 patent should not be limited to a racemic mixture. The preferred embodiments of the '372 patent illustrate test data for lurasidone *as well as* a mixture of lurasidone and lurasidone's enantiomer. (Appx76-77 (12:31-14:55).) The '372 patent also teaches that its chemical compounds "can have stereo and optical isomers, and *this invention involves these isomers or their mixtures as well*." (Appx72 (4:51-53) (emphasis added).)

As referenced above, Teva previously tried to limit a chemical compound claim to a racemic mixture in the hope of avoiding infringement. *Pfizer v. Teva*, 555 F. App'x at 965-66. Dr. Baldwin has also been previously criticized for providing such an outcome-driven analysis. *Eli Lilly & Co. v. Zenith Goldline Pharms., LLC*, No. IP 99-38-C HK, 2001 WL 1397304, at *8-11 (S.D. Ind. Oct. 29, 2001). For example, in *Eli Lilly*, the court devoted an entire section of its

opinion, spanning multiple pages, titled "The Flaws in Dr. Baldwin's Analysis," to deconstruct Dr. Baldwin's flawed obviousness analysis. *Id.* The court in *Eli Lilly* was not persuaded by the opinion offered by Dr. Baldwin that was based on "a methodology that depends on so many arbitrary and artificial constraints to produce the desired result." *Id.* at *11.

Similarly, Dr. Baldwin's approach to claim construction here is inconsistent. He professes that extrinsic evidence is generally less reliable than intrinsic evidence, but relies primarily on extrinsic evidence to advance his proposed claim construction. (Appx1347 (118:12-21), Appx1353 (150:7-151:4), Appx1355 (158:21-25), Appx1015-1016 (¶¶ 27-28).) For example, even when he looked at the patent claim at issue in the *Pfizer v. Ranbaxy* case and the key language of the specification that this Court considered informative of the claim's scope, Dr. Baldwin said that language was irrelevant to construction of that patent claim and concluded that that claim was limited to a racemic mixture. (Appx1356 (182:23-183:9), Appx1358 (192:14-21), Appx1376 (3:36-54), Appx1382-1383 (Claim 1), Appx1359-1360 (197:20-198:9, 200:16-21).); 457 F.3d at 1289. This, of course, is the opposite of what this Court in *Pfizer v. Ranbaxy* concluded. *See* 457 F.3d at 1289-90. Thus, there is little wonder why, in assessing the credibility of Dr. Baldwin's testimony in this case, the district court did not rely on Dr. Baldwin's opinions and extrinsic evidence.

**E.      Defendants' Misinterpretation of the '372 Patent and Its Prosecution History Do Not Support Their Assertions of Error**

Emcure, InvaGen, and Teva argue that the district court failed to correctly interpret the '372 patent and its prosecution history.  (*E.g.*, DBr. 16-17, 30-33.) Specifically, Defendants argue that the district court misinterpreted the specification's teaching that its chemical compounds "can have stereo and optical isomers, and ***this invention involves these isomers or their mixtures as well***." (Appx28, DBr. 16, 30 (emphasis added).)  According to Defendants, this teaching in the description section of the specification "cannot be read to apply to every compound described in the patent that falls within the genus of compound (I)." (DBr. 31.)  Defendants offer no legal or scientific support for their assertion. Instead, Defendants offer the following specious argument: "[u]nder such an interpretation, Compounds 102, 103, 104, and 105, which are unmistakably described as optical isomers, would necessarily be interpreted as including the other isomer and the racemic mixture."  (DBr. 31.)  It is Defendants, and not the district court, that are misinterpreting the specification.  The specification at column 4, lines 51-53 provides the skilled artisan with information regarding the scope of the claimed chemical compounds.  (Appx72 (4:51-53).)  It does not, as Defendants' suggest, seek to redefine Compound Nos. 102-105 from their description in the specification.

Further, it is apparent that Defendants are selectively reading the '372 patent specification.  For example, column 12, lines 25-28 of the patent state that the "*imide compound (I)* and its pharmaceutically acceptable salts exert a significant anti-psychotic activity.  Yet, they are very weak in side effects as observed by conventional neuroleptic drugs." (Appx76 (12:25-28) (emphasis added).)  Emcure, InvaGen, and Teva concede these teachings regarding *imide compound (I)* apply to Claim 14 as well as all compounds of the other 19 claims of the '372 patent. (DBr. 7-8 (citing Appx76 (12:25-28).)  Defendants, however, argue without any legal or scientific support that the patent's teaching regarding *imide compound (I)* at column 4, lines 51-53 has nothing to do with Claim 14.  (*See* DBr. 30-31.)

Defendants also state that applying this important teaching of the patent would eliminate the inventors' ability to claim a racemic mixture or an individual enantiomer if they had chosen to do so.  (DBr. 31.)  Here again, there is no legal or scientific support for Defendants' argument.  If the inventors wanted to claim only an individual enantiomer or only a mixture of enantiomers, they clearly understood how to do so.  But they chose not to add such a limitation on purpose.  Example 1 of the specification describes several preferred embodiments such as the species or group of chemical compounds recited in Examples 1-(a)–1-(e).  (Appx85-86 (30:30-32:23).)  As such, the district court ruled that Claim 14 does encompass lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers.

(Appx30.)  Simply put, and as stated by the district court, Defendants have offered no proof "to escape the impact" of the important teaching of the '372 patent at column 4, lines 51-53.  (Appx29.)

Emcure, InvaGen, and Teva further argue that the district court misread the patent prosecution history.  (*E.g.*, DBr. 31-32.)  As explained above in Section C of the Statement of the Case and Section B of the Argument, the prosecution history supports the district court's construction and contradicts Defendants' proposed construction.  Recognizing that it is improper to import limitations into claims from the specification or prosecution history, the district court correctly determined that Claim 14 encompasses lurasidone, lurasidone's enantiomer, as well as mixtures of these enantiomers.  (Appx27.)

Emcure, InvaGen, and Teva also argue that the district court "failed to distinguish [the drawing in Claim 14] from Compound No. 101."  (DBr. 33.)  The district court, however, did distinguish the drawing in Claim 14 from Compound No. 101.  (Appx19-27.)  The only failure is Defendants' interpretation of the intrinsic evidence.  Defendants argue to this Court that the specification "makes clear that Compound 101 is not limited to only the hydrochloride salt." (DBr. 33.)  But their expert agreed in testimony before the district court that Compound No. 101 was in the form of a hydrochloride salt.  (Appx1342 (56:17-25).)  The district court did not err in its understanding of the specification.

Finally, Emcure, InvaGen, and Teva argue that the district court wrongly characterized their arguments as divorced from accepted methods of claim construction. (DBr. 29.) The district court's view of Defendants' arguments, however, does not constitute error. Instead, it reflects that the district court found Defendants' claim construction arguments to be inconsistent with the intrinsic record. (*See* Appx25-30.) As explained in its opinion, after evaluating the testimony and evidence, the district court observed that Defendants did not claim that the ordinary meaning of Claim 14 is a racemic mixture. (Appx21.) Further, the district court found that Defendants did not argue that their proposed construction was based on lexicography or claim disavowal. (Appx21.) Instead, Defendants advocated for their proposed construction based on two book excerpts that the district court found to be irrelevant and in conflict with Defendants' proposed construction. (Appx20-24.) Defendants' proposed claim construction relies primarily on an alleged convention of how racemates are graphically depicted based on two extrinsic documents that did not exist at the time the '372 patent was filed. (*E.g.*, DBr. 2, 30, 33-37.) And Defendants couple that alleged convention with a laser focus on one of the '372 patent's preferred embodiments (Compound No. 101) to support their proposed claim construction. (*E.g.*, DBr. 2, 30.) A proper claim construction, however, does not ignore important teachings in the specification and is rarely, if ever, correct, when it

excludes preferred embodiments. *Adams v. Perrigo*, 616 F.3d at 1290. Again, the district court properly rejected such a construction.

## CONCLUSION

This Court should affirm the district court's construction of Claim 14, which is firmly rooted in the intrinsic evidence and based on well-established claim construction principles.


Dated: June 26, 2017

Respectfully submitted,

/s/ Preston K. Ratliff II
Preston K. Ratliff II
Joseph M. O'Malley, Jr.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Stephen B. Kinnaird
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700

Charles M. Lizza
William C. Baton
SAUL EWING LLP
One Riverfront Plaza, Suite 1520
Newark, NJ 07102
(973) 286-6700

*Attorneys for Appellees*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a) and this Court's

Rule 28(a)(13), I certify the following:

1.     The attached brief complies with the type-volume limitation of

Federal Circuit Rule 32(a).  The brief contains 7,134 words (according to the

Microsoft Word 2010 count function), excluding the parts of the brief exempted by

Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.     The attached brief complies with the typeface requirements of Federal

Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal

Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a

proportionally space typeface using Microsoft Word 2010 in 14-point Times New

Roman type style.

DATED:  June 26, 2017               By:

/s/ Preston K. Ratliff II
Preston K. Ratliff II
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

## CERTIFICATE OF SERVICE

I, Stephen B. Kinnaird, hereby certify that, on June 26, 2017, the foregoing

document was filed using the CM/ECF system.

By:

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700